The last case this morning is VLSI Technology v. Intel Corporation, 2022-1906. Mr. Lee. Thank you, Your Honor. May it please the Court, my name is Bill Lee, and together with my partner, Warren Fletcher, I represent Intel. There were numerous errors at trial that resulted in a $2.2 billion verdict that is neither supported by the law or the evidence. In my time today, I will try to address both infringement and damages issues, but I would like to take them in a slightly different order than I normally would. I plan to start with a non-comparable argument issue, which makes this case truly unusual. Before we get to that, Mr. Lee, your client has been found liable for almost two-thirds of a billion dollars in damages for actions that are not literally within the scope of the claims. And no doubt you're familiar with Texas Instruments v. Cypress. We said that one must provide particularized testimony of linking arguments as to the insubstantiality of the differences. We stated that such evidence must be presented on a limitation-by-limitation basis. And the concern of this Court was that equivalence should not be pronged to, it should be the exception, not the rule. I looked through the jury instructions and I didn't see any reference to a particularized testimony and linking argument. Now, did you object to that, or did you waive it, or was that accomplished by the rest of your argument? Your Honor, it was not waived. And the question of the sufficiency of the doctrine of equivalence testimony on the 759 patent by Dr. Conte was at issue at JMOL after their direct case. It was at issue at JMOL after we closed the evidence, and it was at issue on the post-trial motions. In those post-trial motions, including the JMOL, did you make the particularized linking argument argument? Yes, it's there. And, Your Honor, we made three arguments, all of which go to the question of whether the doctrine of equivalence finding for the 759 patent can be sustained, and it cannot.  There's five pages of testimony from Dr. Conte, and all he says is, they're different. And there's only one limitation at issue, right? Yes. So it definitely was limitation-specific. He said it doesn't matter whether everything is in the first device or something. The first master, you can combine that with a certain code that's in the controller and send it and be received by a controller with other code, right? Yes, that's the problem that he had, and the three problems. One is, he never says why that is instantaneously different. He never says why it accomplishes… I thought he said any engineer would understand that that's insignificant, and I forget. I don't know if he said, but there's also the little passage in the patent that says everything that can be done by hardware can be done by software in our patent or any combination. Your Honor, all he said was it's a design choice. I think that's what you're referring to. It's a design choice. He never said they're instantaneously different, and he couldn't because they were very, very different. The reason that in the Intel products, the PCU does the work is the Intel products are multi-core products, many different cores. And the PCU, and having all the software there, allows the PCU to make the determination on a system-wide basis. It is completely different from what was described in this old patent. He didn't touch any of the bases that Judge Lori identified. And, Your Honor, the best indication… Just to be clear, did you have evidence of your own that says here's why these things are really, really quite substantially different? Absolutely. And what I just described to you is in the record, which is the PCU has all of this robust software because there are multi-cores in the Intel products. And because there are multi-cores, you want to look at the question of clock frequency across the system, not for a specific core. And the reason it's all in the clock controller or the PCU is precisely because of that. So not only did he hand wait at the question of whether they were instantaneously different, there was undisputed evidence of just why they were different. And, Your Honor, the two other reasons that I think that is correct are the following. To accept his Doctrine of Equivalence testimony requires you to conclude, requires the jury to conclude, that the PCU, the clock both is issuing the request and receiving the request. That is inconsistent with the claim which has a master device, the master device, which is separate from the clock controller. Literally, it's nonsensical. His Doctrine of Equivalence testimony takes what was found not literally to infringe and takes a clock controller and says it's doing both. It's issuing the request and it's receiving the request. And if you needed further confirmation that that's just simply... But not alone, right? Not alone. Not alone. And if you needed further confirmation that you can't make that equivalence argument, if I draw your attention to Appendix 8372 to 8373, this is where, after four rejections, the claims have been all canceled. New claims come in with a master device, the master device. And if you look at what they say about Ansari, the description of Ansari is precisely, precisely the same as the equivalent that they're describing now. It is two components. One, issuing a request to the boss. A second, the arbiter in Ansari saying, here's a correct clock frequency. And what they say is, no, no, that doesn't work. That's not what we're claiming. And we're going to have to make it clear by saying it's a master device. Which page is this on? What page is this on? It's 8372, Your Honor, to 8373. So, I think the answer to Judge Rory's opening question is, they don't have the particularized testimony. They don't touch the correct basis. It really is just conclusions. But in this case, it's a nonsensical conclusion because it has a component both issuing the request and receiving it when the claim requires the alternative. And then, when you get to the file history, they have specifically distinguished a two-component device by saying that a two-component device where someone, one, issues a request to the boss, and the second issues a request on the frequency, that's not covered by the claim. They're actually using equivalence to cover precisely what is covered by the claim. Now, let me do this as we're on the infringement issues. Very quickly, go back to the 373 patent because I think this one's even easier than the 759 patent. The accused memory is the C6S RAM. The claimed minimum operating voltage is ring retention voltage. There is no dispute on this record anywhere that ring retention voltage is not used in any way, in any way, in switching the voltage to the C6S RAM. It's not in the source code. It's not in their expert's testimony. In fact, we've cited their expert. There seems to be what is really a claim construction issue here as to whether that needs to be the trigger or not, right? I don't think you're wrong. No, I wouldn't, I don't think that's, I don't think we would agree. I think if you look at the claim in its entirety, it says you determine a minimum operating voltage. It then says you store it, and then it tells you that there are two, just two states. When you're at or above the minimum operating voltage, you supply one voltage. If you're below, you supply another. So one thing that's clear from the claim and its plain meaning is the minimum operating voltage has to be. But your argument is that the ring retention voltage isn't the trigger, right? It could be the trigger. As the abstract says, you could use it, is the words of the abstract. If you look at figure one and the portion of it describing component 12 and the clock controller, it is telling you that the minimum operating voltage is involved in some way, in some way in determining which voltage is being supplied. There is no evidence on this record, absolutely no evidence on this record, that the ring retention voltage is used in any way. In fact, Dr. Conti, when we cross-examined that. The argument is it doesn't need to be. The claim doesn't require that, right? Actually, I think the plain meaning of the claim does require being involved in some way. That's their argument. That's their argument. And you never asked for a claim construction on this, right? Yes, that's their argument, Your Honor, and it's inconsistent with the structure of the claim. It's inconsistent with the abstract. Under the Hewlett-Packard line of cases, if you didn't ask for a construction, you know, the jury has to sort of consider the claim on its face and make its determination, and the question is whether its determination is reasonable. If the question, Your Honor, actually is whether the determination, there's substantial evidence to support a reasonable conclusion, and we would suggest there is not. The idea that ring retention voltage doesn't need to be involved in any way at all, and you can infringe on a claim is inconsistent with the claim on its face. You don't have to go any further than that, and it's truly inconsistent when you look at the claim right at the abstract and specific case. You wanted to tell us why the licenses weren't comparable. Your Honor, I don't need to tell you why the licenses weren't comparable. I'll try to do this in a minute to reserve the form. Let me just say, this is the way that I understand that issue. It's perfectly clear that in the absence of your little set piece about the sale of sports teams, at the end of Dr. Sullivan's testimony, this would not be remotely justifiable, and when I think about technology licenses and sports teams, I know which one is less comparable. Your Honor, the answer is, even with their argument on the sports teams, it's— Even with their argument, you did this. You said something about something as incomparable as it's possible to do to put— you must have thought it was relevant to put in issue something about size. Your Honor, actually what happened precisely is during Dr. Sullivan's direct examination, he touted his work for Major League franchises, for NFL franchises, NBA franchises, and the work he did on valuations for them. He had previously described that work resulting in a $2 billion valuation of the Los Angeles Clippers as astronomical. All we did is cross-examine on that basis, but the argument that Your Honor has just summarized, which is inconsistent with what occurred at trial, the district court did buy that argument, Your Honor. Well, I don't think that's worth debating. Can I switch—since we have very limited time, can I switch you to something else? Sure. So you have an argument about Dr. Anam-Raram having chosen the wrong set of numbers to use by looking at core C7 instead of package C7. It seems almost, I think, undisputed that he chose the wrong one. You have some indication that that could well have made a difference. So that might not be harmless error. So here's my question. Assuming all that's right, does it affect only the 373 damages or does it affect also the 759 damages? The error that Dr. Anam-Raram made with the power model affects the 373 damages. And the court requested an exhibit number. The best demonstration of Dr. Anam-Raram's error is that if you go to Appendix 3132, you will see the work that he did with the different residency information, and you'll see residency information for both— I'm sorry. Are you trying to convince me that it was an error? I'm confused. Okay. In the 579— It could be an error that's off by a factor of two. But in the 579, as I understand it, your argument is that he used something more than the infringing feature to measure the power use. That's exactly right. What he did—and actually, you don't have to take my word for it, because their other expert, Dr. Conti, told him what to do, told him to measure just a portion of the entire ring domain, the ring bus. He didn't do what he was asked to do. He measured the number for the entire domain, which indisputably includes non-infringing features, indisputably includes non-accused features, and indisputably was not what he was asked to do by Dr. Conti. And the end result of that is erroneous information again. And Dr. Sullivan's model, which we've described the other problems that it has, is predicated upon both of those numbers. There is a reason, Your Honor, that this methodology that Dr. Sullivan has offered, in the words of Dalbert, has never been published, has never been presented. Nothing has ever happened anywhere. Can you just pinpoint again for me what was the specific error that, I think you were just discussing with Judge Dyke, that bears on the 759? So for the 759 patent— Not the generic errors about methodology. No, no, no. Very specific. And let me give you the specific slide, if I could. So for the— He used the entire ring domain— He used the entire ring domain rather than— Ring bus power. If you look at— I think I remember that, in fact, that's what he did. Right. What I'm not remembering so well is how undisputed or disputed it is that that made a difference. Well, this is now their words, not ours. At Appendix 3215— 3215. Appendix 3215. Dr. Conte said that measuring the power drawn by the ring domain, the ring bus only, was necessary, and I'm now quoting Your Honor, to isolate the benefits of the invention claimed in the 759 patent, and I quote, exclude the contribution of non-accused technologies, features, and functionality. And instead of doing the ring bus, hit the entire ring domain. Okay, but he didn't quantify. Nobody quantified what the difference is. No, but without a Delphi, taking the entire ring domain, you're going to have— it would necessarily increase the damages amount by some amount. No one's quantified that precise amount. Both of his errors, both of his errors make the methodology unreliable. Both of his errors necessarily would have increased the amount of the damages. Is Your Honor— You've exceeded your argument, but we'll give you five minutes of rebuttal. All right. Thank you, Your Honor. Mr. Lampkin. Good morning. May it please the Court. At the risk of starting with the capillary, I'd like to start where Mr. Lee left off, which was the 579 damage estimate and the use of the ring bus, allegedly instead of using—I guess it was the ring domain as opposed to the ring bus. I think that's not an error in the slightest. And the answer, believe me why, will be at two places in the appendix. The first is at 2722, and this is Dr. Conti, who is our expert, explaining what he had asked Dr. Nadram to do. He says, you want the fraction of power used by the ring domain. That means the ring bus and some of the little attached things to it. And then you ultimately would give the measure of the benefit of the 709 patents. He was clearly talking about the ring domain. And then I know that Mr. Lee points to the fact that there's other places where he talks about the ring bus. But if you look at page 18085 and 18086, Dr. Conti makes clear that when he says ring bus, he actually means domain, and he says the CLR domain is often called the ring bus. So he's actually talking about the domain, not the bus. This is not a mistake, and it actually makes perfect sense in terms of what they were trying to do. Because Intel didn't have a non-infringing alternative, we came up with our own to narrow things down. And one of the things we noted is, look, you could avoid infringement by not ramping up and down the ring bus, which is the whole domain. You don't have to change the frequency for that. And so if you find the benefit of just doing that, the ring bus, then you're going to narrow damages to that person. I'm sorry, I'm not understanding what you're saying. Are you saying that, in your view, the ring bus and the ring domain are the same thing? Yes. If you look at 18085, Dr. Conti says the CLR domain. Which volume? Oh, that's 18085. Five, five, five. It's the very first page of five. And you look at the bottom, and it says, second line from the bottom, the CLR domain, often called the ring bus. So if he's talking about the domain, the ring bus, he's using these things interchangeably. And he also goes on to explain why you wouldn't distinguish between just the bus and the domain. Because he says, it runs on a single voltage power frequency domain. And then he goes on on the next page and explains that Intel not only doesn't design their processors, does design their processors for an entire domain, but it wouldn't be commercially acceptable to try and distinguish between the two. So he's actually saying, when you're doing the non-infringing alternative, you're going to look at the entire domain. But if I quickly move on to the other issue, which is Dr. Anagram's use of... So if I understand what you're saying, is that he didn't separate the two in making the analysis, but it's not possible to separate the two? He doesn't separate the bus from the domain because it doesn't make sense, because the frequency and the voltage for those are going to change in parallel on any commercially acceptable processor. So the advantage of the patent... Okay, where is the testimony that it doesn't make any difference in terms of power usage, which of the two you consider? I'm sorry, I didn't... Where is their testimony that it doesn't make any difference in terms of the power calculation, whether you use the bus or the entire domain? No, I don't think that's what I was trying to say, Judge Dyke. I was trying to say that you wouldn't vary the bus without the domain, because you would not have a commercially acceptable product, and because the non-infringing alternative is to not vary the ring bus. It's not to vary only the bus... So what you're saying is that because the ring bus is an indispensable part of the ring domain, it's okay to use the ring domain power consumption? You use the ring domain because that is the non-infringing alternative. You would actually have to move them together. No, no, I'm not understanding what you're saying. Is what I said correct or not correct? I think it is correct in the sense that the non-infringing alternative is not to just ramp down the bus, because that's not going to be a commercially acceptable... Well, forget about non-infringing alternative. It doesn't have to be a non-infringing alternative. If it's part of something which is non-infringing, you ordinarily would think that you have to separate the power consumption from one feature and other features in. I should be clear. What we're trying to do is we're saying, what is the advantage of having the invention versus not having the invention? And if you can avoid infringement in a particular way, and the way you could avoid infringement is by not ramping, by not changing the frequency for the ring domain, that would be a non-infringing alternative. And so when you're trying to calculate the advantage, it's the infringing alternative versus the non-infringing alternative. Having the ring domain frequency go up and down versus not having it go up and down. Mr. Lampton, why wasn't it an abuse of discretion for the district court not to allow a licensed offense? Intel is licensed under FinChan, and DLSI is an affiliate of FinChan. Yeah, so I should also mention that the patent covers the cores and the bus and the ring, so ramping on all three, so it's not like you're actually having a non-infringing. You're covering actually infringing uses, infringement. In terms of the licensed offense, it seems to me that there's two independent reasons why there was no abuse of discretion there. And the first is that Intel never suggested below that it wanted the district court to actually adjudicate that licensed offense. It's a repeated request. Time and again was to say, this court, the court below, can't actually adjudicate it. What we want you to do is we want you to add the defense, sever, and stay, so that we can adjudicate the defense elsewhere in Delaware, first in the chancery court, later in the district court in Delaware. Both those options are now exhausted. Yeah, they're now exhausted. Although, conceivably, if the issue went back, there's a certification option after the development of the facture. I'm sorry. Certification to the Delaware Supreme Court after the development of the facture. Potentially, but remember, there's two rationales the district court gave. One is that... There are timing issues. Put that aside. Okay. And then the other rationale the district court gave, which is independent, is that it was futile to add the defense. Right. Why is it futile? I guess I've read the six or seven seemingly, I mean, cited and seemingly relevant chancery in, I guess, one Delaware Supreme Court decision, and it seems to me they don't provide a clear answer. It seems to me that what provides the clear answer is actually that FinGen license. And the FinGen, and also the nature of the, what they filed as their amendment. Right, but that, I'm sorry, but Judge Albright, the question of the meaning of the license wasn't really litigated. I mean, you may have arguments about why the license doesn't end up covering this, or maybe it's not retroactive or something, but that wasn't litigated. Judge... Oh, I think Judge Albright fairly read. Judge Albright was saying that you have not shown control, which would be one way from getting out of the fact that these aren't FinGen licenses. But just by limiting his notion of, the notion of control to ownership, which seems at least questioned. No, I don't think he's limited to ownership because he says they're effectively strangers and that VLS and that... They were strangers when the settlement was done, but no longer. Oh, they are strangers. They effectively, the owners of VLSI have the same advisor fortress, but that's like saying that you have the same lawyers and the same law firm. But isn't that, I mean, I guess, why isn't that a factual question? And I thought about the sort of securities law investment advisor and whatnot, but none of that's been developed here. Well, Your Honor, there's two things. First, if you look at the actual pleading, and this is on page, I think, 3400 or so, their only allegation was that they came under ownership control. And under this court's decision in Selge, you can't just say ownership and control. You gotta have facts. And there's simply no facts in that proposed pleading, so it was futile for that reason alone. If you just take a look at... Sort of Twombly reasons? Yeah, Twombly reasons. You just can't say common control, and Selge makes that absolutely... This court's decision in Selge makes that clear. We make that point, and I don't see any response or reply. But in addition, if you look at the agreement, there's two things that make it clear that they could not possibly prevail here. And one is that they don't have anything approaching evidence of common ownership control. There's no common ownership control. And where is the common control? The only suggestion is that the owners of VLSI, these pension funds, are advised by the same company, Fortress, that was involved in Xinjiang. But that doesn't show it. And then there's also the statement that, oh, gee, perhaps there's a fact that VLSI has board members there. But the Supreme Court in Best Foods says, even if you have overlapping board members, it's assumed that they changed their hats. Okay, but you're asking us to dive into the facts and, you know, futility requires some clarity that there's no possibility of prevailing here. And, you know, I understand your quamble argument, but you're suggesting that we look at the facts here and say, well, you know, they allege control, but there really isn't any control. And beyond that, Your Honor, there's also the fact that there has to be a license that could be given without any compensation to a third party under this agreement. And NXP is a third party that, if they were around at the time of this agreement, they would have to be compensated. It is absolutely clearly futile. But at the very least, there's no abuse of discretion saying, yes, I waited for the Chancery Court to rule. That came and left. That's what you asked me to do. Now you're asking me to wait for the District Court in Delaware to rule on it. I'm not going to hold up the judgment that long. I'm done here. I've done my job. I'm going to take judgment. It's now a full year after the verdict. No abuse of discretion saying, that's it. I'm not going to wait any further. And that kind of docket control is at the core of a District Court's discretion, how long it's going to wait for other things to happen. And it turned out to be especially true because if you'd waited for the District Court in Delaware to rule, Intel settled that without getting the issue resolved. So we'd still be waiting for a resolution from another court. Was the request to sever or could it have been understood to be a request to sever, or was it Rule 21, not Rule 42, so it would become a separate case and the judgment in the existing case would be final? I don't think that was the intention and that's certainly not the way it was treated and nobody argued it that way. It was treated as if severing it apart from the defense and just raising it later once you realized what happened in the other courts. And even when there was a hearing in November of 2021, when we already know what the Delaware Chancery Court has done, they were still saying, look, what you're going to do here, Judge, is the right remedy is to allow the motion to amend and then wait for the decision of the Federal District Court in Delaware early next year. And then they asked the District Court to enter judgment based on what the District Court in Delaware did. So it's all a process of saying, wait, wait, hold up the judgment. So the motion for leave to amend was made when in relation to the trial date? The motion to leave to amend was three months before the scheduled trial and it was three months after they had learned. So why isn't three months enough time to prepare? Well, as the District Court pointed out, and he was in Knoll's docket, the expert discovery had closed, summary judgment motions had already passed, and they had all passed during the time of delay. And Intel wasn't asking to raise it at the trial. Intel was still saying, hey, Judge, you cannot actually adjudicate this. We have to adjudicate in Delaware. Let's just go ahead with trial. I will adjudicate in Delaware and I will come back to you later and ask you to enter judgment in accordance with that. I do feel like... Wait, wait, wait, I'm confused. When they made the motion for leave to amend, they obviously were no longer making the argument about its leave for the Delaware Chancery Court, right? No, no, they were very clear, Your Honor, that it was a combination of leave to amend and to stay and sever. They were saying this will not affect the trial date because we're going to sever it and stay it. And we're going to wait for Delaware to handle that and we'll go ahead with our trial. And that's actually very clear in their filing. It's a very brief filing. I know you want to switch off the topic, and so do I. Talk to me about the particularized linking argument or whatever that phrase is relevant to the Doctrine of Equivalence. Yeah, so I think that the Doctrine of Equivalence argument, it was down to just a single, single limitation. And if you turn to page 36 of our brief, I think that's going to show you what the difference is. Where's the witness' testimony about this? What page have you found it? So the witness' testimony is on page... Sorry, I'm looking at the Prosecution's Composite Component. But the witness' testimony, the conclusory, is around 2707, 2706, 2694. It's in that range. And he was explaining just a single limitation. So his testimony was five pages? Five pages for a single limitation, and you can tell... Okay, and which page does that start at? That would start at 2694, I believe. Which volume is that? Volume 2. But I can follow... If you also turn to page 36 of the brief, I can explain exactly what his testimony was. Because he's starting with one limitation, just one. And that is that the first master device provides a request to change a clock frequency. And the only variation from that is the first master device, the core, which is core 1 or core 2, is now going to do it in combination with P-code. It's not going to do it itself. It's going to have the assistance of P-code. And how about receiving the request? Isn't that part of it? Pardon? Receiving the request. And receiving the request will be the PCU decision instructions. And that actually is... If you take a look at the claim, it says, a programmable clock controller having an embedded computer program, therein the computer program including instructions to receive the request. So instructions can receive the request. And what receives the request here is PCU decision instructions. And if you look at the document next to that diagram on page 36, this is an Intel document making clear that when one module, the P-code, is talking to the PCU instructions, what's coming is actually a request. It says, the third step is to request a higher or lower frequency. You've got something in the red brief? Yes, page 36. If you look at the request, it's the P-code is making a request to the PCU decision instructions. So it's making a request to instructions, which is precisely what the claim calls for. And it says that the request is to higher or lower the frequency. So it's a request, according to the Intel document right here, and also on page 45 of the appendix, the district court points out that the code also calls it a request. So it's a request, even though it's a module in the PCU talking to another module in the PCU. I know this is a little bit of a shift, maybe a large shift, but where is the testimony where Dr. Conte says, here's why this difference from literal infringement is insubstantial? So that's on page 2707, Your Honor. And he says it's just a difference where an engineer draws this data line. And that makes perfect sense because you could have put, this is all on a single chip, Your Honor. This is all on a single line. Where on that page? Pardon? Where on that page? Minus 12 to 15, I think. Yes, I think that sounds right. At this time, we're looking at, yes, page 14, lines 14 to 15. So basically, it's half a page on why it's insubstantial. Yes, Your Honor, but I can, and it's very clear that it's insubstantial when you look at the chart because remember this chart right here on page 36, this is actually just a single chip. It's all on a single device. And so it's a matter of drawing lines between whether you're going to call the P code and move it and say it's going to be part of the core, which we call the master device, or whether you're going to call it part of the PCU. And it's just a choice between the two. And I know Mr. Lee says, oh, that's a big difference whether you call the P code part of the PCU or you call the P code part of the core, but it actually isn't, and that's not an argument they made to the jury or made below. But is one item supposed to meet two claim limitations? I'm not sure I follow one item following two claim limitations, but I think the answer is the claim limitation of receiving. The request in receiving it. Yes, so what receives it, and if you look at the claims, it's clear. It says there's a computer program including instructions to receive. So it's the instructions that receive. There's a computer program with instructions to receive. The instructions receive. Here, the PCU decision instructions receive. And what makes the request? The P code makes the request. Another module within it. So it's two things. Intel's own document describes the request. But that's not, you know, that kind of detail is not in your expert's testimony. That's the problem. I mean, it's supposed to be linking testimony. And that testimony doesn't say that. Well, the testimony does explain that it doesn't make any difference because it's just a line drawing choice because he had the diagram up and he was explaining to the jury that, look, this is all one chip. It's just a matter of whether you put the P code here or you put it down there, whether you describe the request as the core at making the request or you make the request in connection with the P code. So you said he had the diagram up. How do we know that? That's just from memory, Your Honor. I don't know if I can point that point to him saying the diagram's up. But I also would like to respond to Mr. Lee's suggestion that somehow it just makes a big difference because it's affecting what universe you're looking at in terms of cores when you're making a decision about how to allocate your clock speed. And that's actually true regardless. Well, I can point out that Dr. Conti is demonstrative. Which is why I keep pointing to it. But it actually doesn't make a difference because, remember, the PCU is either looking at core one and core two making the request, which is the literal infringement read, or it's looking at the associated P code from the two of them that are making the request to the PCU decision instructions. So the thing making the decision, the instructions, is always looking at multiple core requests. It's either looking at the request directly, core one and core two, or the request as it comes through the P code. Before we run out of time, please address the comment that Judge Toronto made earlier about the damages calculation for the 373 and the technical inputs, which seems to me pretty clear that your expert relied on non-infringing products or features in making the calculation because the C6 RAM is the only infringing feature and yet he used core C7 and packaged C7, one of which doesn't include the infringing feature at all and the other one includes it only among other things. So I should be very clear exactly what happened because I think this makes a huge difference. To the extent there's a suggestion that he took a value for a core state, a core C7 state, and plugged it in what should have been a packaged state. No, no, no, he didn't do that. But what he did is he was looking at the Intel spreadsheet and figuring out which one was most comparable and instead of using the power usage for an infringing feature alone in making that calculation, he made the comparison based on a non-infringing product and a product which was only partially infringing. Judge, that's not actually correct. If you turn to page 1584 of the appendix, he was actually asked to clarify what he was looking at when he's choosing what he considers the most accurate model, 1584, and that's back in volume one. And he explains that what he's looking at is across this whole spectrum of numbers to confer that when he chose MobileMark and Nancy, these two Intel datasets, that he was choosing what he thought was the most important. And I should make it very clear that this is all Intel data and what he's doing... I understand that, but in making his choice, the point of comparison he's making, by his own admission, was using Core C7, and that's not something that's infringing. What he did was... And remember, Intel does not say that the workloads he chose were not representative, and that's on page 194. It doesn't say there's a workload that's better, and it doesn't say that any of this data is wrong. I don't understand what you're saying. My question is, he used Core C7 in choosing which values from the Intel spreadsheet to use, and that was a non-infringing product. He actually used all of the core residencies, what he called the whole spectrum of numbers to confirm, and he did that for a reason, because he's trying to figure out which of all of these valid Intel models, and he chooses MobileMark, and he chooses Nancy. He says, okay, why am I not going to choose Anatoly? Why am I going to choose Nancy? And he ran to me, and there's no argument that any of those are no good, that any of them are wrong. He's actually just over... He testified specifically that he used Core C7. He testified that Core C7 is not infringing. And he used, in addition to Core C7, the whole spectrum of numbers, because what he did is, he said, no one's saying... The whole spectrum of numbers of what numbers? Of what he did when he did his own real-world tests, and he said, I have a bunch of options. If you look at page... Maybe I should slow it down. He took it 3137, which is an image of Intel's power model. In the upper left-hand corner, you see these things, and so you select the actual infringing processor, right? And then you choose residency and workload, and the workload he selected is MN12, which is MobileMark, a well-known simulator of how people use computers. And he chose Nancy. And Nancy is an Intel engineer who ran these simulations on this infringing processor. So we're down to the infringing processor with MobileMark, and it's an Intel run with Nancy. And he says... And this is, again, on page 3141. And he wants to say, I want to make sure that Nancy is the right one to choose, that I shouldn't choose Anatolia, I shouldn't choose something else. And these are all Intel data. Intel doesn't say any one of them is wrong or not representative. And he says, what I'm going to do is I'm going to do my own test, and this is all a matter of just over-verifying. I'll do my own test, and I'll take a look, and I'll see which one corresponds to my own test. And so he runs his own test, and he gets all the data that you see on 3132. And that includes core C7 state, and then system C7 states, also bold, two-thirds of the way down, there's two columns of that, and a whole bunch of other things. And what he just says is, look. And then he describes it on page 3141. So what you're saying is that in making these choices, he used his own data. But he also testified that he used non-infringing data. He used what he's looking at. He's looking at the residencies. And what residencies mean is, when you run the computer, you're looking at the various states. He's looking at core C7, right? Yes, he looks at that. He looks at core. He looks at packages. So you're saying that it doesn't matter because it's only one of the things that he considers? It's not the only thing he considers? This is what he's trying to do. No, no, answer that question. Is that your argument? My argument is... That it's okay to use something that's irrelevant because it's only one of the things that he used? It's not irrelevant. I'll tell you the difference between core C7 and package C7, and you'll see why you would make sure that you're going to look at that. Core C7 simply means you have a single core that's taking a nap. Package C7 is you have a group of associated cores taking naps, core versus package. And so what he's going to do is he's going to take Nancy's numbers, and he says, look, Nancy's number for core looks a lot like my numbers for core C7. Nancy's numbers for package look like my numbers for package. Nancy's number for other things look like my numbers for things. Nancy's numbers most correspond to what I observed as real-world results. And when you're looking at residencies, this is the various states the computer can be in. And he says, gee, all the states the computer can be in, Nancy looks like the real world in my view. And so when he does that, he's not choosing something that's a wrong input. He's simply saying, Nancy's simulation looks like my simulation overall, and therefore it's okay to choose the Nancy dataset. But when Intel's not going to say Nancy's wrong, when Intel will not say Nancy's not representative, and their experts said, and Intel won't say something comes with a different result, that isn't error. Thank you, Mr. Lampkin. We've given you plenty of extra time. Thank you. I think we've evened it up. We've missed only 11 minutes of the model. Let me make five points. Could we just start with the last one while it's fresh in our minds? On Dr. Anavarum and what he did. And using core C7 and package C7. Your Honor, I just don't think you can reconcile what Mr. Lampkin said with the record. If you look at page 3132, you'll see the results of the work that he did. And you'll see that he coded two things, core C7 and package C7. You will see that they differ. One's 80% and one's 40%. He did that for a reason, because he used that residency data to basically determine the workload information he wanted to input into the Intel model. He chose 80% as the number, not 40%. So he actually took a higher number for a non-accused feature, applied it to the accused feature, and reached the conclusion that the accused feature would be used about twice as much as his own analysis would suggest. He did this all for a reason. The idea that there was no reason for him to do this. And then he takes that residency data, residency means how long you're using it, translates it into workload, and when you look at the exhibit that we provided support with, the panel with, you'll see that they're both residency and workload inputs. You put those in, and then the model does its work. It has all these algorithms, tells you power consumption, lots of different things. By inputting workload, it's twice as much as what the simple numbers said. Okay, but Mr. Lampkin is saying that he didn't just use core C7 and package C7 as the inputs to choose the right data from the Intel spreadsheet. He said he used his own data. Now, actually, Your Honor, if you look at, this is where I said I had trouble reconciling the argument with what occurred. If you look at appendix 1580 to 1581, he said he used that data to do the match. He didn't make this argument about, I had lots of other data myself. He said, I used the data for core C7 to do the match. And that's why the number comes out twice as much. Okay. So let me do the other part of Dr. Anavarum that goes back to the beginning of Mr. Lampkin's argument. And when you were asking about the difference between the ring bus and the ring domain, if you look at their brief carefully, they start to collapse the concepts of power and frequency. Yes, the ring domain and the ring bus might operate at the same frequency. But Dr. Anavarum was measuring power consumption. And when you consider Mr. Lampkin's argument, you'll notice that he keeps coming back to frequency. That's not what Dr. Anavarum was measuring. He was measuring power consumption. And when you're measuring power consumption, he has a problem because the ring domain, the full component, consumes more power than the ring bus. That's why Dr. Conti said, measure the power consumption of the ring bus, not the ring domain, so you could start to isolate the contribution to Q's feature. So this question of frequency is just entirely irrelevant. It was made in the brief. It's not what Dr. Anavarum said. So on both paths, Dr. Anavarum has mistakes, mistakes at their core, that translate into the amounts specifically. And I was reminding you, Your Honor, that there is in the record... Just to be clear, this ring bus, ring domain issue bears on the 759? 373, Your Honor. Just the 373? Yeah. No, no, no. Yes. I was collapsing the two. The ring domain, ring bus issue bears in 759. So we've got two, what you say, are two very focused Avanarum errors, one for each? Yes. So the error I was just addressing was for... The ring domain issue is for the 759. The other error that he made was for the 373. Both of them are critical for the analysis. Both of them have an effect. And, Your Honor, to go to your question, at A5372-73, there actually is information from our expert, Dr. Sylvester, about the effect of measuring just the ring, measuring the ring domain as opposed to just the ring bus. So that's... Exactly. You said that was 85? A5372-5373, paragraphs 761-767. So that would be point one. Point two goes back to the Doctrine of Equivalence. And some of the testimony that Mr. Lampkin cited to you at the beginning was the literal infringement testimony, not the Doctrine of Equivalence testimony. And when they were providing their literal infringement testimony, it was, here, the core is the master device. The PCU is the clock controller, all this software that he was referring to. They had them as two distinct devices. The jury didn't accept that argument. The testimony that goes to your question on, is this equivalent to having the master device work with a portion of the PCU to be requesting change in frequency, is it 2707-2710? And the only effort to get at equivalence is what Judge Toronto cited, which was it's a design choice. Everything's a design choice. Well, there's the sentence before the design choice. Yeah, he said... It just doesn't matter where the engineers draw the line. That's actually more specific. And the answer is it does. If you're going to say it doesn't matter... Why can't the jury conclude otherwise? Your Honor, because the jurisprudence of this court requires a little bit more than just saying it doesn't matter. You have to say why it doesn't matter and why the difference would be insubstantial. And the figure that was apparently part of the demonstrative doesn't indicate that. That's their figure, and everything that they were drawing boxes around are in the PCU, which for a little infringement purposes, as I said, was a completely separate component. So if you have a PCU... The PCU is a power control unit. One of the documents calls it a package control unit. No, all of the software... I'm just asking about the acronym. It's PCU is the power control unit. Yes, power control unit. All the software is in the power control unit. It's a separate component, separate from the cores, and for a reason that I described earlier. They identify these as separate components for little infringement purposes. Now, if you generously interpret Dr. Conti's testimony, he's suggesting they take some of that software and... Maybe I'm just confusing that. I thought the absolutely typical way of saying something is an equivalent is you show what's literally required and say this is just a really small change. So the fact that it's mostly describing a little infringement case and it's departing from that, that's practically definitional of Dr. McCormick's. Your Honor, I don't think so. And this is the circumstance in this case where the master device is the core, the PCU is the clock controller, and there's a specific request described for little infringement purposes. Then you get to the doctrine of equivalence, and they say, well, the master device is not just... The master device is the core, but it's working with this software in the PCU. The request is different. They have to make the request different because now the request doesn't occur until you get within the PCU, and the PCU is making the request to itself. It doesn't make sense. There's a reason it's done that way, and it's not enough because if Your Honor's articulation was sufficient, the doctrine of equivalence testimony in most jury trials would take 60 seconds, and the Texas Instrument cases and the other cases, the courts say no. This is an exception to the little... This is on top of little infringement. You have to prove more, and they haven't done it, and when you haven't done it in a circumstance where the result is nonsensical, where the structure of the claim requires two components, and you have the second component both issuing the request and receiving it, and it's inconsistent with what you said in the file history, it cannot be that there's a doctrine of equivalence argument. Fourth and fifth points. Mr. Lamkin said that the Delaware case was settled. That's not true. In the Delaware case, the magistrate judge found that there was reason to allow us to amend... They dismissed their case with prejudice. That's what I mean by... It was not settled. Oh, okay. It's gone anyway. Without a doubt, you're correct. It's gone, and it's gone after two events. I guess what I'm quarreling with is... The magistrate judge allowed the amendment. That seems not to have been appealed to the district judge. Is that right? Yes, and found that it was not futile and would have allowed us to... Without explaining why it was not futile. Yes, it was not futile because the license agreement can be controlled or on worship. Did the magistrate judge explain this? Yes. She looked at it and said it wasn't futile. I can't remember precisely what she said on that issue, but she dealt with the same futility arguments that were made to the district court in Texas. Am I remembering right that Dr. Sheets says for the reasons stated in the oral hearing, but we don't have a transcript because, of course, everything in the will is... That's why I'm having trouble recalling the specifics now, but the same arguments that were made to the district court in Texas were made to the magistrate judge in Delaware. Recall that this license agreement has a little bit of a conundrum. It says that the license agreement should be litigated and determined in the Delaware court, but it also says that if you're sued and you want to assert it as a defense, you can assert it as a defense. And all we're looking for is an opportunity to assert it as a defense. Last point, if I could, Your Honor, quickly, on the license agreement itself, point A and point B. Point A is the district court said that there was prejudice to VLSI because the trial had occurred. We moved three months before the trial occurred. This was in the middle of the pandemic. There were two mandamus petitions to this court to help determine the trial date. We moved, and we moved before the dispute resolution process had been completed. Second point is the issue is not ownership. It's control, and we alleged common control, common court of directors, common management of the companies. There is no doubt that we've made the allegations, and we're just requesting an opportunity to fully discover all the facts which we think support our allegations. And it's a defense that has consequences here. It has consequences in the follow-on cases in Texas. It has consequences in the follow-on case in California. Thank you.